# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **JOSEPH PERONACE**, | **CIVIL ACTION** |
| Plaintiff, |  |
| *v.* | **NO. 23-3943-KSM** |
| **CITY OF PHILADELPHIA**, |  |
| Defendant. |  |

### MEMORANDUM

**Marston, J.**                                                    **April 16, 2024**

Plaintiff Joseph Peronace claims Defendant City of Philadelphia violated his Fourteenth

Amendment right to due process while he was incarcerated at Philadelphia's Curran Fromhold

Correctional Facility ("CFCF") in May 2022.  (Doc. No. 17.)[1]  The City moves for summary

---

[1] Peronace frames his claim as a violation of his Eighth Amendment right to be free from cruel and unusual punishment, but the record suggests he was being held at CFCF as a pretrial detainee.  (*See* Apr. 9, 2024 Draft Hr'g Tr. at 3:15–16 (plaintiff's counsel stating he believed Peronace was "picked up on a violation of parole"); *see also* Peronace Dep. Tr. at 99:12–100:24 (filed in this matter as Doc. No. 27-4) (testifying that he believes he was taken to CFCF on an arrest warrant issued in connection with a dispute he was having with his father).)  Accordingly, Peronace should have pleaded his claim as arising under the Fourteenth Amendment Due Process Clause, not the Eighth Amendment.  *See United States v. Dobson*, 585 F.2d 55, 59 (3d Cir. 1978) ("[E]ven though we recognize that the basis for a parolee's detention is the underlying sentence from which [they] ha[ve] been paroled, until such time that the parole violator is recommitted after a hearing, and [their] incarceration thereby made certain and fixed as to duration, no term of imprisonment can be said to have commenced or resumed.  In this respect, a parole violator is no different than a pretrial detainee who is merely awaiting trail and who, until conviction and sentencing, cannot commence service of a term of imprisonment."); *White v. Lycoming Cnty. Prison*, Civil No. 1:21-CV-00781, 2023 WL 4865985, at *5 (M.D. Pa. July 31, 2023) ("[A]bsent allegations that a parole violation hearing was held, it appears that Plaintiff was purely a pretrial detainee at the time of the alleged conduct."); *see also Hubbard v. Taylor*, 399 F.3d 150, 167 n.23 (3d Cir. 2005) (recognizing "distinction between pretrial detainees' protection from 'punishment' under the Fourteenth Amendment, on the one hand, and convicted inmates' protection from punishment that is 'cruel and unusual' under the Eighth Amendment, on the other"); *Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d Cir. 1993) ("Pretrial detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process clause." (quotation marks omitted)).  His "failure to do so does no lasting damage, however, as the Supreme Court has concluded that the Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'"  *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (quoting *City of Revere v. Mass. Gen.*

judgment, arguing that there are no material disputes of fact on which Peronace's claim can proceed to trial.  (Doc. No. 27.)  Peronace has likewise filed what he terms a "motion for summary judgment," but which is more properly construed as a motion for sanctions under Federal Rule of Evidence 37(e).  (Doc. No. 26.)  For the reasons discussed below, Peronace's motion is granted to the extent it seeks sanctions but denied to the extent he requests judgment in his favor.  The City's motion is denied.

## I.    FACTUAL BACKGROUND

Peronace was incarcerated at CFCF from May 19 to May 30, 2022.  (Doc. No. 29-1 at ¶ 1.)  During the intake process, he was designated as noncompliant after the facility's medical staff had difficulty locating a vein from which blood could be drawn.  (*Id.* at ¶ 2.)[2]  As a result, he was placed on medlock status and assigned to a single-occupancy cell on Unit B2, Pod 1.  (*Id.* at ¶ 25.)

On May 20, while in his cell, Peronace suffered three seizures.  (*Id.* at ¶ 3.)  After the first seizure, he called out "for a long time," and in such a manner that he was "sure that anybody that was on that block," including "other inmates, the block workers, and the guards," "would have heard [him] calling out."  (*Id.* at ¶ 4; Peronace Dep. Tr. at 28:14–20.)  Around an hour after he began calling for help, a correctional officer came by his cell.  (Peronace Dep. Tr. at 29:16–31:21.)  The officer asked Peronace what was going on, and Peronace told him that he had suffered a seizure and asked to see a nurse.  (*Id.*)  The officer said he would get assistance for

---

*Hosp.*, 463 U.S. 239, 244 (1983)).

[2] Peronace was designated noncompliant despite explaining to the nurse that medical staff often struggle to take blood from him.  (Peronace Dep. Tr. at 23:22–24:7 ("[W]hen I had gone into intake, they were attempting to take everybody's blood, and the nurse had extreme difficulty getting blood from me. And I made them aware that—that's often the case and that, when I'm in the hospital, they use a—an ultrasound or put a PICC line in . . . .").)

Peronace and left.  (*Id.*)  Another hour passed, and a nurse came to Peronace's cell.  (*Id.* at 31:22–32:23.)  Peronace told the nurse that he had suffered a seizure, and she evaluated him and took his vitals before leaving.  (*Id.* at 32:24–33:5, 36:5–17.)  At this point, Peronace was not having any trouble with his mobility.  (*Id.* at 38:13–20.)

A few hours after his first seizure, and after he was evaluated by the nurse, Peronace suffered a second seizure.  (*Id.* at 38:21–39:3.)  Peronace again called out for assistance and asked for help from "multiple guards" and "other staff" who walked by his cell.  (*Id.* at 39:22–42:2, 51:15–54:24.)  Most of the staff continued walking by his cell, but one or two correctional officers said they would call for help.  (*Id.*)  At this point, Peronace was not having any trouble with his mobility.  (*Id.* at 55:9–14, 56:1–4.)

Before any help arrived, and about three hours after his second seizure, Peronace suffered a third seizure.  (Doc. No. 29-1 at ¶ 6.)  After this seizure, he lost consciousness, and when he came to, he was on the floor of the cell and had lost all mobility below his waist.  (Peronace Dep. Tr. at 55:1–8, 56:5–17.)  Peronace once again called out for assistance and continued calling for help "for a very long time" (*id.* at 56:18–24), until a correctional officer told Peronace that he would put out an ambulance call (Doc. No. 29-1 at ¶ 6).

A few hours later, two nurses and two correctional officers went to Peronace's cell with a stretcher.  (*Id.*; *see also* Doc. No. 29-7 (CFCF record of stretcher call on May 23, 2022, noting that a stretcher was called, that Peronace told the responder that he "had a seizure" and was experiencing "back pain").)  They asked Peronace what had happened and whether he could make it to the stretcher on his own, and he explained that he had suffered a seizure and could not move his legs.  (Peronace Dep. Tr. at 59:1–12.)  At that point, one of the correctional officers explicitly refused to help lift Peronace onto the stretcher, calling him "a disgusting fucking

junkie," and the other three responders likewise refused to help him up.  (*Id.* at 59:4–63:13; *see also* Doc. No. 29-1 at ¶ 6.)  After a discussion amongst themselves, the guards and the nurses told Peronace that he "had to get up and walk to the stretcher or else the stretcher was going to leave."  (Peronace Dep. Tr. at 59:4–63:13; *see also* Doc. No. 29-1 at ¶ 6.)  When he was unable to stand, they "left and took the stretcher with them."  (Peronace Dep. Tr. at 59:4–63:13; *see also* Doc. No. 29-1 at ¶ 6.)

The night after this final seizure, while Peronace was lying prone on the ground, his "cell door was buzzed open and three or four" men entered his cell and "punched and kicked [him] repeatedly."  (Doc. No. 29-1 at ¶ 7.)  He claims the men were block workers—fellow inmates who hand out food on the block during mealtimes.  (*Id.*; *see also id.* at ¶¶ 19–21.)  Peronace claims that he was assaulted by these men another three to five times while he was incarcerated at CFCF in May 2022 and that during the assaults, they would tell him to stop calling out for help and to "shut the f up."  (*Id.* at ¶ 7; *see also* Peronace Dep. Tr. at 65:19–71:20, 75:1–8.)  After the final assault, he remembers overhearing the block workers speaking to the correctional officer who had refused to help him onto the stretcher, and the officer asked the workers, "[W]hat did you guys do[?]  You know, he's not moving . . . .  I didn't ask you to . . . take it that far."  (Peronace Dep. Tr. at 84:22–85:19.)

Despite the block workers' threats and repeated assaults, for the roughly ten days that Peronace was in his cell, he continued to call out and ask for help from "everybody" that walked by his cell, which he estimated to be approximately "100 people."  (Doc. No. 29-1 at ¶ 10; *see also* Peronace Dep. Tr. at 65:11–65:18, 77:20–24.)  Despite his repeated requests, only "one lady," a behavioral health social worker, tried to help him, telling him that she would put in a medical request and document his concerns.  (Peronace Dep. Tr. at 78:4–79:8; *see also* Doc. No.

89-8 at 2 (social worker progress note dated May 26, 2022, recording, "[Inmate] was asleep on the floor and wrapped in a blanket. 'I can't walk and I'm having seizures. I need help'. [Inmate] dragged his body on the floor with his arms. [Social Worker] informed medical after this appointment about [inmate] behavior and statements. [Social Worker] informed CSS.").) Throughout this ten-day period, Peronace was unable to walk, and he was left to lie in his own excrement with no access to clean clothing. (Doc. No. 29-1 at ¶¶ 11–12; *see also* Peronace Dep. Tr. at 80:7–11 ("Q. And so when you were forced to lie in your own waste, was it for the entirety of after your third seizure to when you were transferred out of your cell? A. Correct.").) Dirty food trays were also allowed to stack up in his cell, to the point that by the end of his initial incarceration, approximately 30 food trays were in the cell. (Doc. No. 29-1 at ¶ 14.)

On May 29 or 30, 2022, correctional officers finally removed Peronace from his cell, but only after forcing him to clean the cell using a broom and trash bag while lying on the floor. (Peronace Dep. Tr. at 106:6–23 (testifying that the correctional officers "wanted [him] to clean the cell before they would get [him] a stretcher . . . . And not being able to move . . . [he] sat up the best [he] could and tried to do whatever [he] could . . . with the broom" before "dump[ing] all the food trays into the trash").) Once the cell was reasonably clean, Peronace was taken to the prison health services wing either on a stretcher or in a wheelchair. (*Id.* at 90:15–24.) After speaking with Peronace and performing an evaluation, the facility's physician sent Peronace to Jefferson Torresdale Hospital. (*Id.* at 91:9–93:6; *see also* Doc. No. 29-11.) The physicians at Torresdale, in turn, found Peronace's case "more severe than they were equipped to handle" and transferred him to Thomas Jefferson University Hospital. (Peronace Dep. Tr. at 93:15–94:22.) After a few days, he was returned to CFCF on June 10, 2022, where he remained for approximately one month in the health services wing. (*Id.* at 95:13–97:9, 110:17–21; *see also*

Doc. No. 29-12 at 4.)  Although he regained some limited mobility of his lower extremities during that time, Peronace did not regain full mobility until after he was transferred out of CFCF. (*Id.*)

Also on June 10, 2022, Peronace's criminal defense attorney, Scott Sigman, Esquire, sent a letter via fax and email to CFCF Warden Steven Angelucci and to Philadelphia City Solicitor Diana Cortes.  (*See* Doc. Nos. 29-10, 29-13.)  In that letter, Attorney Sigman identified himself as Peronace's attorney and explained that during Peronace's time at CFCF, he had suffered multiple seizures, was left in his own excrement, and had been the victim of a "brutal attack resulting in his hospitalization."  (Doc. No. 29-10 at 2.)  Attorney Sigman then stated, "It is my understanding that CFCF o [sic] the Philadelphia Prisons has a video surveillance system that may have captured some or all of the events associated with Joseph Peronace between May 19, 2022 and June 3, 2022."  (*Id.*)  He directed the City to "preserve all video surveillance discs or tapes showing Joseph Peronace in Quarantine, having seizures, and being attacked," warning that "any destruction of these materials will be deemed to be an intentional spoliation of evidence." (*Id.*)  Despite this letter, the City failed to preserve any video surveillance from May 19 to May 28, 2022, and instead, in response to Peronace's discovery requests in this case, produced three clips from when Peronace was in the facility's medical unit on May 29, 2022.  (Doc. No. 26-6 at ¶ 35.[3]  *But see* Doc. No. 26-17 at 13 (listing nine video recordings from CFCF dated May 29, 2022).)[4]

---

[3] The Court takes this fact from Peronace's Statement of Undisputed Facts (Doc. No. 26-6), to which the City has provided no response.  *See* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider that fact as undisputed for purposes of the motion.").

[4] This is just one example of the City refusing to take its obligations seriously in this case.  In addition to the Warden's failure to preserve all relevant video footage after receiving Attorney Sigman's letter, the City's attorney in this litigation demonstrated a concerning lack of professionalism and accountability.  Of note, she unilaterally canceled depositions the morning they were scheduled, ignored

## II.    PROCEDURAL HISTORY

Peronace filed this action in the Court of Common Pleas for Philadelphia County on September 13, 2023.  (Doc. No. 1 at ¶ 1.)  The City removed the case to this Court on December 12, 2023 (*id.*), and after initial motion practice, Peronace filed his Second Amended Complaint, which is the operative pleading in this case (Doc. No. 17).  Peronace brings this suit pursuant to 42 U.S.C. § 1983, arguing that the City violated his Fourteenth Amendment rights while he was incarcerated at CFCF by:  (1) failing to provide Peronace with habitable and sanitary conditions, including access to clean clothing and assistance reaching the toilet, (2) failing to provide Peronace with necessary medical care when his legs were rendered unresponsive following three seizures and multiple assaults, and (3) allowing fellow inmates into Peronace's cell where they assaulted him on four to six occasions.  (*Id.*; *see also* Doc. No. 29 at 1–2.)  The City moves for summary judgment, arguing that Peronace has failed to put forth evidence to support a § 1983 claim against the City under all three theories.  (Doc. No. 27.)  Peronace has also filed what he terms a motion for summary judgment, which seeks judgment in his favor as a sanction for the City's spoliation of video recordings depicting the hallway outside of his cell from May 19 to 28, 2022.  (Doc. No. 26.)

The Court addresses Peronace's motion for sanctions before turning to the City's motion for summary judgment.

## III.    MOTION FOR SANCTIONS

Peronace asserts that City employees intentionally failed to preserve video footage from the outside of Peronace's cell between May 19 and May 28, 2022.  (Doc. No. 26-2 at 6.)  He

---

opposing counsel's document requests (despite repeatedly asking during depositions that those requests be directed to her), and failed to respond to Peronace's statement of undisputed material fact.  As the Court stated during oral argument, we expect more from the experienced attorneys practicing in this District.

argues that this failure amounts to spoliation and that judgment in his favor is an appropriate sanction for the videos' destruction.  (*Id.* at 5–8.)

Peronace's motion is governed by Federal Rule of Civil Procedure 37(e).  *See Bistrian v. Levi*, 448 F. Supp. 3d 454, 464 (E.D. Pa. 2020) (explaining that Rule 37(e) "provides the exclusive remedy for spoliation of electronically stored information ('ESI'), foreclosing reliance on the court's inherent authority"); *id.* at 467 (finding video footage of the prison's hallway "was digital, so Rule 37(e) applies"); *see also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (explaining that the Rule "forecloses reliance on inherent authority or state law to determine when certain measures should be used").  Rule 37(e) sets out both "the standard for determining whether spoliation of ESI has occurred" and the "general framework for determining the appropriate sanction for spoliation of ESI."  *Bistrian*, 448 F. Supp. at 465–66.

## A.     Spoliation of Video Footage

Generally speaking, "[s]poliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *Bistrian*, 448 F. Supp. at 465 (quoting *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 110 (E.D. Pa. 2005)).  In the ESI context, spoliation occurs when ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery."  Fed. R. Civ. P. 37(e).  The *Bistrian* court, relying on the Rule's advisory committee notes, broke this definition into four elements:

> First, the spoliating party was under a duty to preserve when the loss occurred. Second, the lost ESI was within the scope of the duty to preserve. Third, "the information was lost because the party failed to take reasonable steps to preserve" it. Fourth and finally, because ESI "often exists in multiple locations," spoliation occurs only where the information is truly lost and not recoverable elsewhere.

448 F. Supp. 3d at 465 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment); *accord Tejada v. Delbalso*, Civil Action No. 3:18-cv-01096, 2021 WL 2457747, at *2 (M.D. Pa. June 16, 2021).  Here, Peronace argues that each element is satisfied because video footage from outside of Peronace's cell should have been preserved once the City received Attorney Sigman's June 10, 2022 preservation letter, and despite receiving that letter, the City did not preserve any footage from outside of Peronace's cell, which resulted in the videos' irretrievable loss.  (Doc. No. 26-2 at 5–6.)  The City does not dispute that the footage of the hallway outside of Peronace's cell from May 19 to May 28, 2022 is irretrievably lost.  (*See generally* Doc. No. 28.)  Neither does it dispute that its duty to preserve was triggered, at the latest, by Attorney Sigman's June 10 preservation letter.  *See, e.g.*, *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013) (recognizing a "document preservation letter or any other correspondence threatening litigation" can "trigger a duty to preserve evidence"); *Wright v. Cam Hiltz Trucking*, No. 13–CV–14690, 2014 WL 6675382, at *3 (E.D. Mich. Nov. 25, 2024) ("While Hayward may not have had a subjective anticipation of litigation, the Court finds that this is not dispositive of either Cam Hiltz's or its insurer's anticipation of litigation.  The preservation letter sent by Plaintiff's counsel was no idle communication.  It unequivocally communicated the likelihood of a suit being filed; the specific demand that evidence be preserved was a clear signal that litigation was reasonably likely.").[5]  Instead, the City contends

---

[5] Although Peronace does not argue as much, it seems that the City's duty to preserve the video footage was triggered *before* it received the preservation letter.  (*See* Powers Dep. Tr. at 90:19–23 ("[I]f I'm on duty and I have a reportable incident, such as an assault on staff, *an IP [incarcerated person] on IP assault*, you know, an unusual situation that has to get what we call flashed, then we, we go ahead and preserve [the video]." (emphasis added)); *id.* at 125:13–16 (testifying that an "IP on IP assault is an investigatable [sic] incident, and that would have triggered preservation of a video"); *see also* Doc. No. 29-17 at 5 (medical records from May 31, 2022, which reflect Peronace telling physicians that "he was assaulted multiple times while incarcerated"); Powers Dep. Tr. at 62:13–65:3 (explaining that two correctional officers stay with an inmate at all times while the inmate is at the hospital and thus, the officers would have overheard Peronace mention the assault to his physicians)); *Bistrian*, 448 F. Supp. 3d

that no spoliation occurred because "there is no evidence that any video was actually suppressed or withheld." (Doc. No. 28 at 8.) The Court disagrees.

First, the City argues that no evidence was withheld because it fully complied with Attorney Sigman's preservation letter by preserving and producing footage from when Peronace went to CFCF's health services wing on May 29, 2022. (Doc. No. 28 at 9.) The City reasons that because the preservation letter requested only "footage '*showing* Joseph Peronace in Quarantine, having seizures, and being attacked,' all of which allegedly happened inside Plaintiff's cell," and there are "no cameras that capture the inside of Plaintiff's cell[,] . . . [n]o such purported missing video of the type and view requested by Sigman exists." (*Id.*) The suggestion is that City employees preserved all video evidence that they thought responsive to the letter's request, and the City was not under a duty to preserve any additional footage. But the City has not provided any evidence to show that the individual(s) who received the spoliation letter interpreted the letter in the way it suggests,[6] and such an inference is belied by the record.

Notably, the preservation letter states that CFCF's "video surveillance system . . . may have captured some or all of the events associated with Joseph Peronace between May 19, 2022 and June 3, 2022," including him "[b]eing the victim of a brutal attack" in his cell. (Doc. No. 26-12 at 2.) A reasonable prison employee receiving such a request would recognize that footage of individuals *entering Peronace's cell* during the relevant time period falls within the scope of Attorney Sigman's request, even if there was no footage from the inside of the cell.[7]

---

at 469 ("In the spoliation case law, certain kinds of incidents are viewed as being especially likely to lead to litigation. Incidents in which inmates are injured in prison are one such category . . . .").

[6] Indeed, it appears that the City does not even know who saved the videos because the City attorney never spoke to Warden Angelucci about the videos, who saved them, why only certain videos were saved, or whether older footage had been overwritten at the time CFCF received Attorney Sigman's letter. (*See* Apr. 9, 2024 Draft Hr'g Tr. at 19:15–23:22.)

[7] There is no dispute that the video surveillance system would have recorded every time someone

*See Bistrian*, 448 F. Supp. 3d at 468 ("A party is under a duty to preserve what it knows, *or reasonably should know*, will likely be requested in reasonably foreseeable litigation." (quotation marks omitted and emphasis added)); *Martin v. Wetzel*, Case No. 1:18-cv-00215-RAL (Erie), 2020 WL 6948982, at *2 (W.D. Pa. Nov. 25, 2020) ("This is an objective test, asking whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." (quotation marks omitted)); *cf. Charoff v. MarMaxx Op. Corp.*, CIVIL ACTION NO. 18-4712, 2020 WL 1694484, at *5 (E.D. Pa. Apr. 7, 2020) ("The Court finds unavailing Defendants' argument that Plaintiff only sought video of the precise spot where she fell; Defendants base their position on semantics . . . .   Assuming *arguendo* that Defendants' reading of the interrogatory [seeking video footage] refers *only* to the precise location of the accident, Plaintiff's preservation letter was explicitly broad in scope, and it should have caused Defendants to preserve video of other parts of the store.").

In addition, Major Patricia Powers, the deputy warden responsible for the policy and audit division of the Philadelphia Department of Prisons, testified that when the Department receives a preservation request covering multiple days and camera angles—like the letter sent in this case—the practice is to reach out to the attorney to try to "narrow down" the request to the footage that is most relevant.  (*Id.* at 95:1–96:15, 127:4–11.)  The City has not suggested that such steps were taken here.  Last, it is noteworthy that Major Powers testified that it is the Department's "standard procedure" to preserve recordings from "cameras in the vicinity" when there is an investigable incident, and that an inmate on inmate "assault is an investigable incident . . . that would have triggered preservation of a video."  (*Id.* at 125:7–16.)  In other

---

entered Peronace's cell.  (*See* Powers Dep. Tr. at 132:23–133:23; *see also id.* at 81:16–87:13 (testifying that the cameras are motion activated and that cameras were positioned to see the cell doors, including Peronace's cell door) (filed as Doc. No. 27-5).)

words, the City's own preservation policy suggests that, having been alerted by Attorney Sigman[8] of a possible inmate on inmate assault, the City should have preserved video from "cameras in the vicinity" regardless of the specific words used in the preservation letter. *See* Fed. R. Civ. P. 37(e) advisory comment note to 2015 amendment ("Although the rule focuses on the common-law obligation to preserve in the anticipation or conduct of litigation, courts may sometimes consider whether there was an independent requirement that the lost information be preserved. Such requirements arise from many sources—statutes, administrative regulations, an order in another case, or *a party's own information-retention protocols*." (emphasis added)).

Second, the City argues that there is nothing to suggest "any video was actually suppressed or withheld" because Attorney Sigman's request came 11 days after Peronace was taken to the hospital, at which point, "the prison's automated motion sensor video recording system" could "have overwritten any footage before May 29, 2022." (Doc. No. 28 at 8.) But there is no evidence that the CFCF's recording system actually overwrote earlier footage. To the contrary, Major Powers testified that even in "a really chaotic, busy area," she has never seen "a situation where [she] couldn't go back [at least] 14 days." (Powers Dep. Tr. at 88:22–89:2; *see also* 89:3–5 ("Q. Have you ever heard of a situation where you can't go back at least 14 days? A. No sir.").) And even then, the recordings "[g]enerally [go back] a little bit longer than that," and in some cases, can go back as far as 30 days. (*Id.* at 87:23–88:21.) Accordingly, even assuming that the system would have overwritten after 14 days and that the City was not aware of its duty to preserve until it received the June 10 preservation letter, CFCF should have been

---

[8] As noted above, the record suggests that multiple CFCF employees knew Peronace had been assaulted by fellow inmates before Sigman sent his letter on June 10, 2022, including the officers who were present when Peronace reported the assaults to hospital physicians. *See supra* n.4; (*see also* Peronace Dep. Tr. at 84:22–85:19 (testifying that he overheard a correctional officer speaking to the block workers about the assaults)).

able to at least preserve footage from May 27 and 28, 2022, as well as May 29, 2022.

Because the City should have known to preserve the video footage and because there is no evidence that the City took *any* steps, let alone "reasonable steps" to preserve video footage from outside of Peronace's cell after receiving the preservation letter, the Court finds the videos were spoliated.

## B.    Appropriate Sanction

Having found spoliation of the video footage, the Court must next determine what sanction to impose. *Bistrian*, 448 F. Supp. 3d at 466 (citing *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 n.5 (3d Cir. 2012)).  "Rule 37(e) provides a general framework for determining the appropriate sanction for spoliation of ESI," which focuses on whether the opposing party is prejudiced by the loss of the information and whether the spoliating party "acted with intent to deprive another party of the information's use in the litigation":

> (1) upon finding prejudice to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon a finding that the party acted with intent to deprive another party of the information's use in the litigation [the court] may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> (C) dismiss the action or enter default judgment.

Fed. R. Civ. P. 37(e).

In addition to the Rule 37(e) framework, the Third Circuit has also "set out three factors for courts to consider in contemplating spoliation sanctions, which—it recently clarified—are still applicable to motions governed by" the current iteration of Rule 37(e):

> (1) the degree of fault of the party who altered or destroyed the
> evidence; (2) the degree of prejudice suffered by the opposing party;
> and (3) whether there is a lesser sanction that will avoid substantial
> unfairness to the opposing party and, where the offending party is
> seriously at fault, will serve to deter such conduct by others in the
> future.

*Bistrian*, 448 F. Supp. 3d at 466 (quoting *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 82

(3d Cir. 2019)).  As with the Rule 37(e) framework, the Third Circuit's factors focus on the

intent of the spoliating party, the degree of prejudice suffered by the opposing party, and the

magnitude of the sanction warranted to cure the prejudice suffered and deter similar conduct in

the future.

e begin with the intent of the spoliating party.  "Because direct evidence of intent is not

typically available, courts generally look to circumstantial evidence to infer a party's intent,"

including "the timing of the destruction, whether there was selective preservation, and what

preservation policies the party had in place."  *Nagy v. Outback Steakhouse*, Civil Action No. 19-

18277(MAS)(DEA), 2024 WL 712156, at *5 (D.N.J. Feb. 21, 2024).  As noted above, there is no

evidence in the record about the particular City employee who chose to preserve the limited May

29 video clips, nor is there any evidence about when that decision was made.  Nevertheless, it is

clear that the hallway footage, like the footage of the health services wing, was in the City's sole

possession and that it chose not to preserve the videos despite notice of potential litigation.  *See*

*Orion Drilling Co., LLC v. EQT Production Co.*, Civil Action No. 16-1516, 2019 WL 4273861,

at *32 (W.D. Pa. Sept. 10, 2019), *aff'd* 826 F. App'x 204, 218 (3d Cir. 2020) (finding the

spoliating party "acted in bad faith" when it failed to "preserve evidence in the possession of two

key employees" despite knowing litigation was likely imminent).  Moreover, the record in this

case reflects selective preservation, with the footage potentially most helpful to the City

(Peronace receiving medical treatment) being preserved, and the footage potentially most helpful

to Peronace (individuals entering Peronace's cell and staff walking by the cell without helping

him) being overwritten.  *See Nagy*, 2024 WL 712156, at *5 (finding intent to deprive where

Outback "reviewed and selectively preserved" video footage of the plaintiff's fall, "with the most

relevant portion of the video (the period of time before the incident) being the shortest portion of

the clip"); *id.* at *6 ("Outback, in determining that it would save some, but not all, of the

pertinent video footage, is completely at fault for the loss of the evidence.").  It is also relevant

that this selective preservation was contrary to the City's own "standard procedure" of

preserving recordings from "cameras in the vicinity" when there is an investigable incident, such

as a potential inmate on inmate assault.  (Powers Dep. Tr. at 125:7–16.)  Accordingly, the Court

finds that the City intentionally allowed the relevant hallway footage to be overwritten.

 Next, the Court considers the prejudice of the videos' destruction to Peronace.  As

Peronace notes, "without the subject video to show whether the [door] to the Plaintiff's jail cell

was opened in order to permit block workers to enter his cell and assault him, the Plaintiff is left

with attempting to prove his case by testimony and a weighing of credibility."  (Doc. No. 26 at

8.)[9]  Although the hallway footage may not have shown the inside of Peronace's cell—and

therefore, could not confirm that he suffered three seizures, was left to lay in his own waste, or

---

[9] Peronace also argues that he is prejudiced by the lost videos because without them, he "is unable
to ascertain which correctional officers . . . enabled and assisted in . . . the block workers to assault the
Plaintiff," and he is, thus, "unable to bring a lawsuit directly against the correctional officers perpetrating
such actions, leaving the Plaintiff's sole recourse as the bringing of the instant *Monell* claim, a far more
difficult standard."  (Doc. No. 26-2 at 7.)  The Court is not convinced.  As the City notes in its opposition
brief, during discovery, Peronace received a "70-page Roster Report of every single CFCF employee with
Name, Rank, Location worked, and shift hours for the entire period and beyond, of Plaintiff's allegations,
between May 19, 2022 and May 31, 2022."  (Doc. No. 28 at 5 n.2.)  With this information, Peronace
could have named individual officers, or at minimum, deposed those officers to determine who may have
been working when the block workers were allegedly let into Peronace's cell.  In addition to this list,
Peronace also received CFCF's internal records, including a report by Ellen Wiener, RN in connection
with the initial stretcher call to Peronace's cell.  (Doc. No. 29-7.)  Presumably Peronace could have
deposed Ms. Wiener to determine which correctional officers refused to assist Peronace onto the stretcher.

the manner of the alleged assaults—there is no dispute that it would have shown, among other things, who walked by his cell during this time, who entered the cell, and who responded to (or ignored) his cries for help.  As discussed later in this Memorandum in connection with the City's motion for summary judgment, these facts are material to Peronace's Fourteenth Amendment claims against the City.  Accordingly, the Court finds Peronace is prejudiced by the City's failure to preserve the hallway footage.  *See GN Netcom, Inc.*, 930 F.3d at 83 (finding prejudice where the non-spoliating party "plausibly suggested that th[e deleted] emails might contain, among other things, important information on the number of PODs and evidence of coercion of PODs. Indeed, [the spoliating party's] own CEO stated that there may have been 'damning statements' in some of the emails"); *Orion Drilling Co., LLC*, 2019 WL 4273861, at *33 ("The prejudiced sustained is not fanciful given both employees acknowledged that they recorded contemporaneous notes regarding Rig 17 and Rig 18 drilling and rig operations and the contracts at issue," and those notes were not preserved.); *Nagy*, 2024 WL 712156, at *6 ("Plaintiffs have been prejudiced in that the video footage from the surveillance camera could have been probative of several key issues in this case, such as whether Outback has actual or constructive notice of a slippery substance on the floor and whether employees acted in accordance with the restaurant's policies for checking the floors.").

Having found the City intentionally failed to preserve the hallway footage and that Peronace is prejudiced by its destruction, the Court is left to decide an appropriate sanction.  As noted above, the sanction imposed should be "no greater than necessary to cure the prejudice," Fed. R. Civ. P. 37(e), and the Court must consider "whether there is a lesser sanction that will avoid substantial unfairness to the opposing party," *GN Netcom, Inc.*, 930 F.3d at 82.  Peronace argues in conclusory fashion that judgment in his favor is an appropriate sanction.  (*See* Doc. No.

26-2 at 8 (asking the court to grant summary judgment in Peronace's favor); Doc. No. 26-1 at 1 (proposed order that grants judgment in Peronace's favor and decrees that "the case will move forward with a hearing limited to an assessment on the Plaintiff's damages").)  But the Court finds a lesser sanction is more appropriate in this case.

The Third Circuit has warned that a "dispositive sanction is warranted only where the non-responsible party's case is severely impaired because it lacked the information that was not produced." *GN Netcom, Inc.*, 930 F.3d at 82 (quotation marks omitted); *cf. Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943 (11th Cir. 2005), *superseded by Fed. R. Civ. P. 37(e) as recognized by Skanska USA Civil Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1311 (11th Cir. 2023) (finding dismissal was a "necessary" sanction where the plaintiff "failed to preserve an allegedly defective vehicle in a crashworthiness case").  Unlike *Flury*, the destroyed video footage in this case was not "the most crucial and reliable evidence available to the parties."  75 F.4th at 943.  Instead, the video evidence was relevant—and its deletion prejudicial—because it may have added credibility to portions of Peronace's first-hand account.  Given this purpose, the Court finds a permissive adverse inference is a more appropriate, lesser sanction that is capable of addressing the prejudice suffered by Peronace.  *See GN Netcom, Inc.*, 930 F.3d at 84 (finding the district court, which allowed a permissive adverse inference instruction, "appropriately relied on the principle that a dispositive sanction is a last resort and should be imposed if no alternative remedy is available" (quotation marks omitted)); *Orion Drilling Co., LLC*, 826 F. App'x at 217–18 (affirming district court's use of "permissive and tailored adverse inference instruction"); *Nagy*, 2024 WL 712156, at *6 (finding an "adverse inference instruction was warranted" and reasoning that "[i]t is a lesser sanction than a dispositive one and is appropriate to address the prejudice"); *cf. id.* ("Rather than the mandatory inference sought by Plaintiffs, the Court finds a

more permissive adverse inference instruction is appropriate.  The Court, therefore, grants Plaintiffs' motion to the extent that the jury may be instructed that Outback intentionally failed to preserve the disputed video evidence and that the jury may presume that the lost video footage was unfavorable to Outback."); *see also Pelino v. Gilmore*, Civil Action No. 18-1232, 2020 WL 2572361, at *6 (W.D. Pa. May 21, 2020) ("[T]he jury will be given an appropriate permissive adverse inference instruction relative to the failure of Defendants to preserve the December 7, 2019 video in violation of an Order of Court.").

Accordingly, Peronace's motion for sanctions is granted in part, and at trial, the Court will instruct the jury that they may presume that the lost video footage was unfavorable to the City.

## IV.   MOTION FOR SUMMARY JUDGMENT

With this permissive inference in mind,[10] the Court turns to the City's motion for summary judgment.

### A.   Legal Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). And at "summary judgment the inferences to be drawn from the underlying facts must be viewed

---

[10] In deciding the City's motion for summary judgment, the Court—which must view all evidence in the light most favorable to Peronace—construes the inference in that light as well and assumes that the City intentionally failed to preserve video evidence from the hallway outside of Peronace's cell between May 19 and May 29, 2022.

in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

### B.    Analysis

As stated above, Peronace brings this suit pursuant to 42 U.S.C. § 1983, arguing that the City violated his Fourteenth Amendment rights while he was incarcerated at CFCF.  Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.  "[T]o state a claim under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States, and second, that the alleged deprivation was committed or caused by a person acting under color of state law." *Jenkins v. Cordova*, Civ. No. 22-6482 (KM) (CLW), 2023 U.S. Dist. LEXIS 84428, *9 (D.N.J. May 15, 2023) (citing *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011)).

Local governments and municipalities are considered persons under § 1983.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  A municipality, however, "may not be held liable for constitutional torts under § 1983 on a vicarious liability theory rooted in *respondeat superior*." *Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013).  Instead, local government and municipalities may be sued directly under § 1983 when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690.

The City argues that Peronace's claim fails because he has not put forth evidence that his constitutional rights were violated, and even if he had, he has not shown that any violation is

properly attributed to the City under *Monell*.  The Court addresses each issue in turn.

### 1.      Constitutional Violation

Peronace argues that the City violated his Fourteenth Amendment rights while he was

incarcerated at CFCF in May 2022 by:  (1) failing to provide Peronace with habitable and

sanitary conditions, including access to clean clothing and assistance reaching the toilet,

(2) failing to provide Peronace with necessary medical care when his legs were rendered

unresponsive following three seizures and multiple assaults, and (3) allowing fellow inmates into

Peronace's cell where they assaulted him on four to six occasions.  (Doc. No. 17; *see also* Doc.

No. 29 at 1–2.)  The City does not dispute that if Peronace's story is true, his Fourteenth

Amendment rights were violated.[11]  Instead, the City argues that Peronace has failed to put forth

---

[11] "In evaluating the constitutionality of conditions or restrictions of pretrial detention . . . the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 537 (1979); *Hubbard*, 399 F.3d at 166–67 (holding proper standard for pretrial detainee challenging constitutionality of conditions of confinement is "the standard announced in *Bell v. Wolfish*"). "Absent a showing of an expressed intent to punish on the part of detention facility officials," the punishment determination "generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation" to that purpose. *Bell*, 441 U.S. at 538.  "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.*  The Third Circuit has "distilled the Supreme Court's teachings in *Bell* into a two-part test," which asks "first, whether any legitimate purposes are served by the[ challenged conditions of confinement], and second, whether these conditions are rationally related to these purposes." *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008).

With this standard in mind, the Court has no problem finding that, if Peronace's testimony is true—and we must assume at this stage that it is—numerous CFCF officials violated his Fourteenth Amendment rights when they knowingly, and without any legitimate purpose:  (1) denied him access to clean clothing and assistance reaching the toilet for approximately ten days while he was lying in his own excrement, (2) denied him access to medical care despite his pleas that he had suffered multiple seizures and was experiencing partial paralysis, and (3) allowed fellow inmates to enter his cell without supervision and with the intent to assault him. *See Duran v. Merline*, 923 F. Supp. 2d 702, 719 (D.N.J. 2013) (applying *Bell* and noting that "the Constitution mandates that prison officials satisfy inmates' 'basic human needs—e.g., food, *clothing*, shelter, *medical care, and reasonable safety*'" (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)) (emphases added)); *cf. Young v. Quinlan*, 960 F.2d 351, 363–64 (3d Cir. 1992) ("Inhumane prison conditions, including prolonged isolation in dehumanizing conditions, failure to provide adequate medical care, exposure to pervasive risks of physical assault, and unsanitary conditions have all been found to be cruel and unusual under contemporary standards of decency.").

evidence that any of these incidents in fact occurred because his "claims remain allegations" and are "directly contravened by the record of policies and procedures," which show his version of events was "impossible." (Doc. No. 27 at 11–12.) The City is incorrect.

Contrary to the City's argument, Peronace relies on more than just unsupported allegations like those included in his Second Amended Complaint. Peronace testified at his deposition that after his third seizure, he was left to lie in his own waste, he suffered numerous assaults at the hands of his fellow inmates, and CFCF employees ignored his numerous pleas for help. (*See, e.g.*, Peronace Dep. Tr. at 65:19–71:20, 75:1–8, 65:11–65:18, 77:20–24, 80:7–11.) Deposition testimony is *evidence* properly considered at summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A) (identifying "depositions" as evidence properly considered).

That said, courts in this Circuit have recognized the "general proposition" that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Gonzalez v. Secy' Dep't Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) (quotation marks omitted). *But see United States v. 717 S. Woodward St.*, 2 F.3d 529, 534 (3d Cir. 1993) ("Since a claimant advancing an innocent owner defense has the ultimate burden of proof on the issue of an absence of knowledge, he or she can successfully resist a motion for summary judgment only by coming forward with competent evidence tending to show an absence of knowledge. An affidavit of the claimant denying knowledge is competent evidence tending to show this and in the absence of other evidence rendering it incredible, such an affidavit creates a genuine issue of material fact."). This proposition has been extended to include "self-serving deposition testimony." *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011). In both circumstances, however, "the issue is not whether Plaintiff has relied solely on his own testimony to challenge the [motion for summary judgment], but whether Plaintiff's testimony,

when juxtaposed with the other evidence, is sufficient for a rational factfinder to credit Plaintiff's testimony, despite its self-serving nature." *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012); *see Runion v. Equipment Transport, LLC*, CIVIL ACTION NO. 1:15-CV-2159, 2017 WL 3839917, at *5 (M.D. Pa. Sept. 1, 2017) ("Generally, self-serving affidavits and deposition testimony are alone insufficient to withstand a motion for summary judgment *when impeached by a well-supported showing to the contrary*." (quotation marks omitted and emphasis added); *see also Gonzalez*, 678 F.3d at 268 ("[T]his is a case where the court, *based on all of the evidence*, can say with confidence that a rational trier of fact could not credit" the plaintiff's affidavit. (emphasis added)); *Irving*, 439 F. App'x at 127 ("In light of both *his earlier testimony and other record evidence*, [the plaintiff's] self-serving deposition testimony is insufficient to raise a genuine issue of material fact." (emphasis added)); *Whitnum v. Meadows at Stroud for Nursing & Rehab., LLC*, No. 3:18-CV-02137, 2020 WL 7773906, at *4 (M.D. Pa. Dec. 30, 2020) ("Given the inconsistencies between the testimony from Plaintiff *and the rest of the evidence*, as detailed above, and the lack of detail offered in the deposition testimony Plaintiff points to, the Court finds that Plaintiff's self-serving testimony, *ipse dixit*, is insufficient to create a genuine issue of material fact." (emphasis added)); *Runion*, 2017 WL 3839917, at *6 (finding the "*remainder of the record* wholly refutes Runion's version of events" and "[d]espite the full benefit of discovery, Runion offers no support beyond his own deposition testimony to corroborate his claim that Equipment Transport was on notice of his intent to file a workers' compensation claim" (emphasis added)).

Here, the City has not shown that Peronace's testimony is incredible as a matter of law. To the contrary, his first-hand account is supported by his medical records, which show that he suffered substantial injuries while incarcerated at CFCF in May 2022 and as a result, was

hospitalized for multiple days.  His version of events is also substantiated by his expert witness, Dr. Avidon Appel, who reviewed Peronace's medical records and found his white blood cell count was elevated when he was admitted to the hospital, a recording "consistent with [Peronace] being neglected after multiple seizures and being left in his own soiled linens."  (Doc. No. 29-19 at 5; *see also id.* ("There have been no indications as to why Mr. Peronace would have developed leukocytosis other than living in unsanitary conditions and remaining in his own waste and soiled bedsheets and clothing.").)  Moreover, unlike the deposition testimony in *Irving*, there is no evidence that Peronace has given inconsistent accounts of what happened during his incarceration.  To the contrary, the record suggests that his story has been consistent from the beginning, with records from CFCF officials, independent physicians, and Peronace's criminal lawyer all showing that he told them the same story that he gave during his deposition. Finally, given the Court's ruling on Peronace's motion for sanctions and our decision to give a permissible adverse inference, the jury could also find that portions of Peronace's testimony would have been corroborated by video evidence.

The City argues that the Court should nevertheless find Peronace's testimony incredible because his account is "impossible" given the City's policies and procedures, which are meant to ensure this type of conduct does not occur.  (Doc. No. 27 at 12.)  But the City's policies and procedures, at most, render Peronace's account questionable, not impossible.  The policies and procedures suggest that if Peronace's account is true, then dozens of CFCF employees would have had to violate proper procedures (*see* Powers Dep. Tr. at 113:1–5 ("If the allegation is that he laid in feces and urine for 10 days, that's not believable.  It's not practical that every one of those folks did nothing, especially if he was asking for help.")); this is certainly something that could have happened, even if the City considers it unlikely.  In other words, the policies and

procedures at most give rise to disputes of fact about whether dozens of correctional officers ignored Peronace's pleas for help, left him without medical attention, and allowed block workers to assault him multiple times.  Those disputes are best left to a jury.

### 2.  Municipal Liability

Having found evidence of constitutional violations, the Court must next determine whether those violations may be attributed to the City under § 1983 and *Monell*.  As noted above, a municipality "may not be held liable for constitutional torts under § 1983 on a vicarious liability theory rooted in *respondeat superior*."  *Mulholland*, 706 F.3d at 237 (3d Cir. 2013); *see also Monell*, 436 U.S. at 690.  Instead, there are two ways for a § 1983 claim against a municipality to proceed:  (1) "[a] plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries," or (2) "[a] plaintiff may put forth . . . that [their injuries] were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice."  *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quotation marks and citations omitted).

Under the first theory—policy or custom—"[p]olicy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict."  *Mulholland*, 706 F.3d at 237 (quotation marks omitted).  And a "course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law."  *Id.* (quotation marks omitted).  Under the second theory—failure or inadequacy—the plaintiff need not identify a municipal policy or custom, and instead, "has the separate, but equally demanding requirement of demonstrating a failure or inadequacy amounting to deliberate indifference on the part of the municipality."  *Forrest*, 930 F.3d at 106; *see also Carter v. City of Philadelphia*, 181 F.3d 339, 356–57 (3d Cir. 1999) ("Where, as here, the policy in question

concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact.").  Under either theory, the plaintiff must tie the unconstitutional act to "the conscious decision or deliberate indifference" of the relevant policymaker, because absent such decision or indifference by "some natural person, a municipality, as an abstract entity, cannot be deemed to have engaged in a constitutional violation by virtue of a policy, a custom, or a failure to train." *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1063 (3d Cir. 1991).

Here, the City argues that Peronace has failed to put forth evidence to show the constitutional violations are attributable to it under either theory.  Peronace disagrees, arguing that he has shown that correctional officers violated his rights pursuant to a municipal custom, or in the alternative, that his injuries reflect the City's failure to properly supervise its correctional officers.  (Doc. No. 29 at 13–14, 20.)[12]  The Court addresses each issue in turn.

### a.  Municipal Custom

As noted above, a municipal "custom" is a practice that "lack[s] the formal approval of a policy," but which is nevertheless "so permanent and well settled as to constitute a custom or usage with the force of law." *Simmons*, 947 F.2d at 1059 (quotation marks omitted); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) (referencing "practices so persistent and widespread as to practically have the force of law"); *Hernandez v. Borough of Palisades Park Police Dep't*, 58 F. App'x 909, 912 (3d Cir. 2003) ("A custom may exist where the relevant

---

[12] Peronace also argues that there is significant evidence that correctional officers violated the City's established policies and procedures.  (*See, e.g.*, Doc. No. 29 at 13.)  But a municipality is not liable under § 1983 merely because municipal employees violated the municipality's properly established policies and procedures.  Instead, liability attaches only "when the policy or custom itself violates the Constitution." *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1027 (3d Cir. 1991).

practice is so permanent and widespread as to have the force of law." (quotation marks omitted)).

Here, Peronace discusses the custom in vague terms:

> M[ajor] Powers estimated that 60 to 70 employees of the Defendant would have gone by the Plaintiff's cell over the course of his 10 days in confinement. This would have been several officers and supervisors over the course of several shifts. Plaintiff's allegations . . . subsequently establish that 60 to 70 employees of the Defendant went by the Plaintiff's cell, observed the conditions that he was living in, and yet took no action. M[ajor] Powers agreed that this would constitute a violation of the Defendant's own policies and procedures, so as to constitute a 'custom' under the legal definition.

(Doc. No. 29 at 14; *see also id.* at 20 (arguing that "a large group of Defendant's employees [were] not following the Defendant's policies and procedures, ie. [sic] creating and acting pursuant to their own custom"); *id.* ("It would not be credible to suggest that 60 to 70 employees, all acting in this matter over a 10-day period does not constitute a pattern of behavior"); Apr. 9, 2024 Draft Hr'g Tr. at 13:3–4 ("The Court: What is the custom?  [Plaintiff's counsel]: I don't know exactly.").)

As this recitation shows, Peronace has not defined the relevant custom or customs with any specificity.  Indeed, despite identifying three constitutional violations—one related to medical care, one to hygiene, and one to safety—he has not specified whether the alleged violations are the result of one custom, three distinct customs, or something else.[13]  *Cf. Bolden*, 2019 WL 133314, at *4 (holding at motion to dismiss stage that the plaintiff's "allegations are insufficient for another related reason:  they suffer from a lack of specificity as to what exactly is the 'custom' at issue . . . .  What exactly did the City's employees consistently do or not do when receiving complaints about troubled City properties?  What pattern of action (or inaction) did

---

[13] As just one example, it is unclear whether Peronace is claiming that there is a custom at CFCF of ignoring inmate's pleas for medical assistance, of refusing inmate's access to clean clothing, both, or neither.

lower-level City employees engage in when they received these complaints?  The Amended Complaint is vague as to all of this . . . ."); *Brower v. Corizon Health Servs., Inc.*, Civil Action No. 15-5039, 2016 WL 5166330, at *9 (E.D. Pa. Sept. 20, 2016) (finding at motion to dismiss stage that the plaintiff failed to "identify a custom and specify what exactly that custom was").

Even if Peronace had identified the relevant custom(s) with specificity, his claim nevertheless fails because he has not submitted any evidence of a "*persistent* and *widespread* practice" of CFCF officials violating inmates' constitutional rights in the ways that Peronace testified his rights were violated.  *Connick*, 563 U.S. at 61; *see also Peters v. Cmty. Educ. Ctrs., Inc.*, No. 11-CV-850, 2014 WL 981557, at *1 (E.D. Pa. Mar. 13, 2014).  On this point, *Peters* is instructive.  In that case, the plaintiff prisoner, who suffered from brittle bone disease, was issued a special needs pass, which noted that he was to be assigned to a bottom bunk while incarcerated. *Peters*, 2014 WL 981557, at *1.  Despite having this pass, the plaintiff's repeated requests for a bottom bunk went unheeded.  *Id.*  Of note, the plaintiff verbally requested a bottom bunk assignment from an unidentified correctional officer conducting rounds and submitted written requests to the facility's warden, chief of security, associate warden, and his assigned counselor. *Id.*  When the plaintiff ultimately fell from a top bunk, fracturing his left forearm and injuring his ankle, he filed a § 1983 action against the municipal contractor that ran the facility.  *Id.* at *1–2. The plaintiff claimed that the contractor "maintain[ed] a custom of ignoring special needs passes and that this custom violated his civil rights."  *Id.* at *2.  In support, the plaintiff put forth "evidence that one or more individual prison officials" ignored his repeated requests for a bottom bunk.  *Id.* at *6.

The district court granted summary judgment for the contractor, finding that even though "multiple individuals may have been involved in ignoring [the plaintiff's] complaints . . . , the

inaction by these individuals only constitutes a single incident for *Monell* purposes" and thus, was insufficient to establish "a widespread custom" of such violations. *Id.* at *6–7, *11.  In so holding, the court, relying on the Supreme Court's discussion in *Connick v. Thompson*,[14] emphasized "*Monell*'s distinction between liability based on *respondeat superior* and liability based on a custom *attributable* to a municipality":

> The law permits this attribution where a practice of constitutional violations is so widespread that a municipality could not plausibly be ignorant of the likelihood of future constitutional violation.  The law treats a municipality's continued inaction in light of this widespread practice as acquiescence and de facto ratification of the custom. It follows that whatever objectionable behavior that occurs during a single incident—whether that be unresponsiveness of several prison officials over the course of fifteen days, as in this case, or the disclosure failures of four prosecutors over the course of a criminal trial, as in *Connick*—that conduct alone is insufficient to put the municipality on notice of the existence of a widespread custom.

*Id.* at *7; *see also Bolden*, 2019 WL 133314, at *3 ("Plaintiff relies solely on her personal experience with one property in asserting that the City has a custom of ignoring complaints and not repairing its properties.  There [are] no facts pleaded about other city properties to suggest that Plaintiff's experience is part of a pattern—i.e., that the City regularly ignores such complaints about properties like the City Property and that Plaintiff's experience is just one more example of this City 'custom' being followed.  This type of one-off experience cannot suffice to establish a City 'custom' under law."); *id.* at *3 n.2 ("The Court is aware of no authority suggesting that a plaintiff can establish the presence of a municipal custom by alleging facts

---

[14] In *Connick*, the Supreme Court considered the plaintiff's assertion that "up to four prosecutors may have been responsible for the nondisclosure of [a] crime report" during his criminal trial in violation of *Brady v. Maryland*. *See* 563 U.S. 51, 61 n.7 (2011).  The Court rejected the plaintiff's argument that this evidence was, on its own, sufficient to show a "pattern of prior violations" that would have put the municipality on notice that it needed more thorough training. *Id.* ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations.").  Instead, the Court analyzed the plaintiff's experience as representing a "single-incident" and proceeded under that theory. *Id.*

solely regarding the action/inaction of municipal employees as to the plaintiff's *own circumstance*—even if a plaintiff interacted with municipal employees on many different occasions.").

Here, as in *Peters* and *Bolden*, Peronace has not submitted any evidence of CFCF employees violating inmates' constitutional rights, apart from evidence of his own experience in May 2022.  Although Peronace claims dozens of employees ignored his pleas over the course of approximately 10 days, that entire experience amounts to a *single incident* for purposes of *Monell*.  *See Peters*, 2014 WL 981557, at *7; *Bolden*, 2019 WL 133314, at *3; *cf. Connick*, 563 U.S. at 61.  And a single incident does not prove a "persistent and widespread" custom.  *See Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989) (explaining that a "single incident by a lower level employee . . . does not establish either an official policy or custom"); *Peters*, 2014 WL 981557, at *7; *Bolden*, 2019 WL 133314, at *3; *cf. Davis v. City of New York*, 75 F. App'x 827, 830 (2d Cir. 2003) ("*[T]wo incidents* of unconstitutional conduct by low-level employees can never provide a reasonable basis for finding a *widespread* or *well-settled* custom." (cleaned up)); *Peters*, 2014 WL 981557, at *7 ("[T]wo instances of inappropriate conduct do not establish a custom under *Monell*."); *Anderson v. City of Philadelphia*, Civil Action No. 16-5717, 2017 WL 550587, at *5 (E.D. Pa. Feb. 10, 2017) ("Even if we took Washington's past incident of misconduct into consideration, two instances of inappropriate conduct do not establish a custom under *Monell*." (quotation marks omitted)).

Peronace's custom argument also fails for a separate reason; he has not shown that a policymaker acquiesced in a custom of constitutional violations.  In addition to showing that a particular practice is "widespread," a plaintiff typically needs proof of prior violations to show "knowledge and acquiescence [in the custom] by the decisionmaker."  *Stokes v. City of*

*Philadelphia*, Civil Action No. 22-0338, 2023 WL 362006, at *10 (E.D. Pa. Jan. 23, 2023)

("Widespread behavior by police officers does not amount to a municipal custom unless there is

'knowledge and acquiescence by the decisionmaker.'" (quoting *McTernan v. City of York*, 564

F.3d 636, 658 (3d Cir. 2009)); *see also Simmons*, 947 F.2d at 1062 (reviewing Supreme Court

case law and explaining that "even when a plaintiff alleges that a municipal custom or practice,

as opposed to a municipal policy, worked a constitutional deprivation, the plaintiff must both

identify officials with ultimate policymaking authority in the area in question and adduce

scienter-like evidence—in this case of acquiescence—with respect to them."); *Anderson*, 2017

WL 550587, at *5 ("A policy and a custom may come in the form of long-standing acquiescence.

Nevertheless, it is incumbent upon a plaintiff to show that a policymaker is responsible either for

the policy or, through acquiescence, for the custom." (quotation marks and citations omitted));

*Brower*, 2016 WL 5166330, at *8 ("[C]ustom requires proof of knowledge and acquiescence by

the decisionmaker." (quotation marks omitted)).

 But again, Peronace has not shown a pattern of similar violations, nor has he put forth

other evidence to support a finding of acquiescence.  *See Cornfield by Lewis v. Consolidated

High Sch. Dist. No. 230*, 991 F.2d 1316 (7th Cir. 1993) ("[A] single isolated incident of

wrongdoing by a non-policymaker is generally insufficient to establish municipal acquiescence

in unconstitutional conduct."); *Sorlucco v. N.Y. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)

("[B]efore the actions of subordinate city employees can give rise to § 1983 liability, the

discriminatory practice must be so manifest as to imply the constructive acquiescence of senior

policy-making officials.")

 In sum, Peronace has not submitted evidence of a custom at CFCF of correctional

officers violating inmates' constitutional rights in the ways that officers violated Peronace's

rights in this case.  Without that evidence, the City cannot be held liable under *Monell*'s policy or custom prong.

            *b.*     *Failure to Supervise*[15]

That leaves Peronace's alternative argument that his constitutional violations were caused by the City's failure to supervise its correctional officers.

A plaintiff may make out a claim against a municipality by showing that their injuries "were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'"  *Forrest*, 930 F.3d at 105 (quoting *Estate of Roman v. City of Newark*, 914 F.3d 789, 798–99 (3d Cir. 2019)); *cf. Connick*, 563 U.S. at 61 (To make out a failure to train claim, the plaintiff must show that the "municipality's failure to train its employees in a relevant respect . . . amount[s] to deliberate indifference to the rights of persons with whom the untrained employees come into contact." (quotation marks omitted and alterations accepted)); *see also Reitz v. County of Bucks*, 125 F.3d 139, 144 (3d Cir. 1997) ("[T]he controlling question is whether . . . the plaintiffs have proven the absence of training that can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional torts occurred.").  Although this theory "arose in the failure-to-train context," it "applies to other failures and inadequacies by municipalities, including those related to [a municipality's] supervision and discipline of its police officers."  *Forrest*, 930 F.3d at 105.

To satisfy this standard, "[a] pattern of similar constitutional violations by [unsupervised] employees is 'ordinarily necessary.'"  *Connick*, 563 U.S. at 62; *see also Berg v. County of*

---

[15] Although this claim was initially argued as both a failure to train and a failure to supervise claim, at oral argument, Plaintiff's counsel conceded at oral argument that the claim was "more properly [brought as a] failure to supervise."  (Apr. 9, 2024 Draft Hr'g Tr. at 2:16–17; *see also id.* at 2:17–21 ("I don't know that I saw training as the major issue based on Deputy Warden Powers—based on her testimony, it sounds like they trained their correctional officers pretty extensively."); *id.* at 6:7–11 ("It's purely a supervision issue.").)

*Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) ("Failure to adequately screen or train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations.").  That said, a plaintiff may proceed under a "single incident" theory if they can show that "a violation of federal rights may be a highly predictable consequence" of the municipality's failure.  *White v. Brommer*, 747 F. Supp. 2d 447, 463 (E.D. Pa. 2010) (quoting *Kline ex rel. Arndt v. Mandfield*, 255 F. App'x 624, 629 (3d Cir. 2007)); *cf. Connick*, 563 U.S. at 69 ("To prove deliberate indifference [based on a single incident], Thompson needed to show that [the municipal policymaker] was on notice that, absent additional specified training, it was 'highly predictable' that the prosecutors in his office would be so confounded by those gray areas and make incorrect *Brady* decisions as a result.  In fact, Thompson had to show that it was *so* predictable that failing to train the prosecutors amounted to *conscious disregard* for defendants' *Brady* rights." (citations omitted)).

Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Connick*, 563 U.S. at 61 (quoting *Bd. of Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)).  From the Supreme Court's discussion in *Connick* and similar cases, the Third Circuit has formulated a three-part test for deliberate indifference:

> [I]n order for a municipality's failure to train or supervise to amount to deliberate indifference, it must be shown that (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.

*Carter*, 181 F.3d at 357 (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)); *accord Forrest*, 930 F.3d at 106; *Estate of Roman*, 914 F.3d at 798; *Duvall v. Hustler*, 447 F. Supp. 3d 311, 335 (E.D. Pa. 2020); *Peters*, 2014 WL 981557, at *8.

Here, there is no real dispute over the first and third elements. As to the first, the record shows that CFCF policymakers knew that correctional officers would require supervision when making rounds and overseeing inmates on the housing blocks. Peronace submitted the report of Donald L. Leach, an expert in "generally acceptable correctional practice, correctional administration, and correctional supervision" (Doc. No. 26-17 at 2–3),[16] who explained that in general, correctional supervisors are tasked with "ensur[ing] knowledge and application of [ ] Constitutional duties by correctional staff" (*id.* at 18). Major Powers similarly testified that at CFCF, supervisors tour the housing blocks to ensure prison policies are followed and to address violations of those policies by correctional officers. (Powers Dep. Tr. at 92:5–16 (describing the duties of "supervising staff," including "doing their own tours" and "overseeing operations"); *id.* at 109:15–110:10 (noting that among other CFCF employees passing Peronace's cell "supervisors [would have done] tours in the area"); *id.* at 114:22–115:11 (noting that "[a]t least one supervisor, very likely two," would have walked by Peronace's cell each day); *id.* at 117:10–12 ("[T]here's always a supervisor coming to tour the housing unit on [an officer's] shift."); *id.* at 137:18–140:3 (explaining that supervisors tour the housing units so that they can discover and address infractions by correctional officers).)

As for the third element, Peronace has shown that in the absence of such supervision, constitutional violations are likely to result. In his report, Mr. Leach explains that "[c]orrectional administrators have long been aware that individuals in custody have the right to adequate and clean clothing, sanitation, medical care, and personal safety," and that "[t]hese categories all

---

[16] Mr. Leach has 40 years of experience in the criminal justice system, working for the Fayette County Detention Center in Lexington, Kentucky as a deputy sheriff, training coordinator, planning and research analyst, and finally, as an administrative deputy, senior. (Doc. No. 26-17 at 2.) In addition, for four years he was "assigned the development and supervision of the Lexington-Fayette Urban County Division of Community Corrections Bureau of Professional Standards, including Internal Affairs; Safety, Sanitation and Standards; and Administrative and Disciplinary Hearings." (*Id.*)

have a very high likelihood of violations of inmate rights without proper, sufficient and adequate policies, training *and supervision* to ensure that the policies are followed."  (Doc. No. 26-17 at 24 (emphasis added)); *see also Forrest*, 930 F.3d at 109 ("Camden policymakers knew or should have known that supervisor-level officers would be confronted with officer misconduct, whether first hand or via complaints and reports from others, and that the wrong choice—failure to report or admonish—would lead to the sort of behavior that occurred here:  officers whose behavior caused the deprivation of constitutional rights, but who had no reason to change that behavior.").

That leaves the second element:  whether the situation involves a difficult choice or a history of employees mishandling.  We begin by considering whether Peronace has shown a "history of employees mishandling" situations like Peronace's experience in May 2022.  As noted above, although Peronace's experience involved the failure of multiple correctional officers and supervisors over multiple days, it is only a "single incident" for purposes of *Monell*.  *See Connick*, 563 U.S. at 61 ("Thompson also asserts that this case is not about a 'single incident' because up to four prosecutors may have been responsible for the nondisclosure of the crime lab report . . . .  But contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and an opportunity to conform to constitutional dictates." (quotation marks omitted)).  And Peronace has put forth no evidence that CFCF officers committed similar violations against other inmates or that there is a history of supervisors failing to adequately patrol such violations.  *See Forrest*, 930 F.3d at 108 (finding failure to supervise claim survived summary judgment because the "record would support a finding that Camden's policymakers knew that their officers would require supervision, *that there was a history of officer supervision being mishandled*, and that, in the absence of such supervision constitutional violations were likely to result" (emphasis added); *Duvall*, 447 F.

Supp. at 337 (finding failure to supervise or discipline claim survived summary judgment because the plaintiff put forth evidence of a "long history of inadequate investigations" into internal misconduct, from which "a jury could find that the dearth of serious supervision and discipline created the conditions for constitutional violations"); *cf. MDB v. Punxsutawney Christian Sch.*, 386 F. Supp. 3d 565, 586 (W.D. Pa. 2019) ("Plaintiffs have not pointed to any other incident involving MDB or any other person, where a Punxsutawney employee caused or failed to prevent harm similar to the harm alleged.  The Complaint does not contain any averments that could support an inference of a pattern indicative of failure to train.  One instance is generally not enough to assert a pattern of violations."); *Brower*, 2016 WL 5166330, at *7 (finding at motion to dismiss stage that the plaintiff failed "to state a claim" against prison employee "under the deliberate indifference standard [for failure to train] because [the plaintiff] fail[ed] to plead that a pattern of similar constitutional violations occurred as a result of the alleged failure to properly train employees").

Peronace has, however, shown that his experience was one that may have presented a "difficult choice." *Carter*, 181 F.3d at 357 (citing *Walker*, 974 F.2d at 297–98); *accord Forrest*, 930 F.3d at 106; *Peters*, 2014 WL 981557, at *8.  A "difficult choice" is one that requires more than the application of common sense" or one where "the employee has powerful incentives to make the wrong choice." *Peters*, 2014 WL 981557, at *8 (quotation marks omitted).  As noted above, Mr. Leach, based on his decades of experience working in correctional institutions, concluded that absent adequate supervision, there is "a very high likelihood" that an inmate's rights to "adequate and clean clothing, sanitation, medical care, and personal safety" will be violated.  A jury could find that officers tasked with providing that care—and the supervisors tasked with ensuring it is provided—may be tempted to ignore an inmate's pleas for assistance,

especially if an inmate has been particularly troublesome, is believed to have a history of drug addiction, and/or the care required involves an unsanitary situation. *See Thomas v. City of Philadelphia*, CIVIL ACTION No. 17-4196, 2019 WL 4039575, at *22 (E.D. Pa. Aug. 27, 2019) ("A reasonable jury could find that City policymakers were aware that Department officers, particularly homicide detectives, would repeatedly be in a position to interrogate suspects and witnesses and submit affidavits of probable cause. A reasonable jury could also find that these situations create a difficult choice because the officers will be motivated to bring a suspect to justice, and that the wrong choice by officers will frequently cause deprivation of constitutional rights." (quotation marks omitted)). Although a close call, given these facts, the Court finds that Peronace has also satisfied the second element for deliberate indifference.

The only remaining question is causation. In addition to showing deliberate indifference, Peronace must also show that the failure to supervise caused the violation of his constitutional rights. *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989) ("[F]or liability to attach . . . the identified deficiency in a city's training program must be closely related to the ultimate injury. Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs."). The City has not challenged this point, and the Court finds it satisfied here. Peronace testified that during his incarceration, he repeatedly called to correctional officers for medical assistance because he could not walk, that he asked for clean clothing and assistance reaching the toilet because he had been laying in his own waste for multiple days, and that correctional officers allowed block workers to enter his cell unsupervised and assault him multiple times. Yet, 70 to 80 correctional officers, *including multiple supervisors*, ignored his pleas and disregarded his deteriorating state. Notably, Peronace's testimony shows that one correctional officer felt comfortable explicitly refusing to

assist Peronace, who she considered a "fucking junkie," onto a stretcher in front of three other prison employees and that she and another correctional officer ultimately left him lying prone in his cell.  Such a response suggests the officers did not fear reprisal from their supervisors.  And there is nothing to indicate that these officers were disciplined for failing to respond to Peronace's pleas, or that any officer was reprimanded when Peronace was sent to the hospital in the days that followed.  In addition to his own testimony, Peronace's expert, Mr. Leach also concluded that "if Mr. Peronace's allegations are true, they could not have occurred unless there was a complete lack of or an insufficiency in the supervision of [CFCF's] policies."  (Doc. No. 26-17 at 24.)  This evidence is enough to survive summary judgment on causation.

Accordingly, the Court finds Peronace may proceed against the City on the ground that his constitutional violations were caused by a failure to supervise.

\*       \*       \*

Peronace has put forth evidence to support a finding that he suffered multiple constitutional violations and that those violations were caused by CFCF's failure to supervise its correctional officers.  As such, the City's motion for summary judgment is denied.

## V.      CONCLUSION

For the reasons discussed above, Peronace's motion for sanctions is granted in part and denied in part.  The City's motion for summary judgment is denied.  An appropriate order follows.